case 19-10826, Tenth Street Residential Association v. City of Dallas. We've read your briefs and record excerpts. We may not have been into the entire record, but we've had a lot more opportunity in the last month. But anyway, we appreciate record citations, and we'll hear first from Mr. Jasso. That's correct, Your Honor. May it please the court. Good morning, Your Honors. My name is Jorge Jasso. I represent the appellant Tenth Street Residential Association, TSRA, or TSRA for short. TSRA is a neighborhood association composed of homeowners and residents of the Tenth Street Historic District, which is the only remaining freedman's town in Dallas and the most intact freedman's town on the National Register of Historic Places. The undisputed facts in the record show that TSRA and its members have standing to stop the city from eliminating the historic community. The city's own resolution attached to the city's brief admits that city actions injure and threaten the historic status of the district, quote, whereas numerous structures have been demolished in the Tenth Street Historic District pursuant to a city-obtained court order, thereby threatening the historic nature of the neighborhood, close quote. That can be found in the appellee's brief, appendix page two. TSRA agrees and is the reason they brought suit to challenge these and other city actions threatening their historic freedman's town. I will discuss the standing elements in their natural order, starting with injury and fact. Organizational and associational injuries are related to the way the city of Dallas applies its historic preservation protections unequally depending on the racial demographics of the historic neighborhood, such as Tenth Street, which is predominantly black and Hispanic. For example, it disproportionately targets minority historic neighborhoods for demolition and provides them with fewer resources such as municipal services and infrastructure. Injuries suffered by both TSRA and its members from the aggressive demolition program the city carries on in Tenth Street and other minority neighborhoods are provided in the record. For example, nearly a third of Tenth Street, at least 73 of 260 residential structures have been eliminated by demolition since it's a landmark district that can be found in ROA 467. Nearly half of these demolitions, at least 32 have taken place since 2010 and all of them pursuant to the city's application of chapter 51A slash 4.501I, here not to refer to as subsection I for brevity, which is the challenge ordinance here or one of the challenge ordinances here that can be found in ROA 470. The organization's injury, TSRA's injury to challenge subsection I is its diversion of resources to counteract its negative effects on Tenth Street. This court in OCA Greater Houston versus Texas held that a diversion of resources such as time spent counteracting an allegedly illegal statute or ordinance was sufficient for Article III injury purposes. And this court further reaffirmed that an injury need not be substantial, it need not measure more than an identifiable trifle. TSRA's diversion of resources here is its time spent in front of the landmark commission opposing demolition applications. Month after month, they show up and they protest and they persuade the landmark commission to try to deny some of these demolition applications. TSRA members also act as interested persons under subsection I. So under that provision, it allows an interested member to try to reach out to the owner and seek to try to transfer title to the property. So these exertions take time, finding the owner, trying to negotiate an agreement to sell the property. This can be found in ROA 1307 through 1309. Like the group in OCA Greater Houston, TSRA has gone out of its way to mitigate the very real world impact the city's demolitions are having on the neighborhood and TSRA members. Injuries to the association members, the undisputed facts show that the injuries to TSRA, to their members, such as those flowing from the demolitions under subsection I, the decrease in property values, the intangible benefits that are lost due to the demolitions for historic district status. For example, TSRA members filed declarations stating demolitions pursuant to the challenge to owners that had a detrimental impact and adversely affected the appearance and appeal of the area, thus detracting from the aesthetic, economic, and recreational value of the historic neighborhood. That can be found in ROA 1307 through 1308. A TSRA member whose home has been in a founding for 80 years stated that the loss of the Freedman's Town through demolition is a destruction of her cultural identity. These assertions are uncontested and qualify as a concrete injury. The Fourth Circuit in Pye v. United States, the Ninth Circuit in Tyler v. Cornwall, and Third Circuit in Society Hill Towers v. Rendell held that these injuries to historic property preservation qualifies as an injury in fact. Injuries related, associational injuries related to our fifth claim, which challenges the city's reliance on historic preservation property tax exemption as causing a disparate impact. Under that provision, any homeowner in a historic district that invests at least 25% of the pre-rehab value gets a 100% tax exemption on city taxes. So since the subsidy is linked to the property value, the higher the property value, the higher the subsidy in the form of city tax exemption. That can be found in ROA 442 to 445. The discriminatory effect of the tax exemption policy is shown by a comparison of the tax subsidy for the predominantly white Winnicott Heights Historic District. So from the years 2014 to 2018, the subsidy that that neighborhood received, that owners in that neighborhood received was approximately $300,000. That's can be found in ROA 492. The city taxes- Mr. Jasso, can I ask you a question? Explain to me why the current owners of the houses in the district prefer and consider it less damaging to the community that a demolition of a dilapidated house is preferable to one that's a dilapidated house that's left standing. Your Honor, TSRA members disagree with that. They are adamant about denying demolitions. They believe that these structures can be renovated. Any nuisance conditions that are alleged can be easily gotten rid of by securing the premises. So they disagree with having- Yeah, but tell me why. Why do they consider a dilapidated house that's unsafe and a public nuisance is better than a house that's a vacant lot after it's been demolished? They believe that the history of the neighborhood, its architectural integrity can be preserved, and the more the city applies for these demolitions, the faster its national register status will be removed. Its city historical designation is also at risk, and preserving these homes is preserving a part of their culture and identity. So as far as conditions that may be will be- is a way to remove some of these nuisance conditions and preserve the homes to be remodeled, repaired at some point in the future. Counsel, can I- let me follow up. Is your request that the court order the city to repair and rebuild homes on 10th Street, isn't that compensatory relief that you're seeking? That's more injunctive relief, Your Honor, because it will in order to all the- to the damages. We're seeking an injunctive relief under the court's equitable power to provide funds and other programs to further, for example, municipal services, et cetera. So it's more in an injunctive nature because it ignores to the benefit of all TSRA members. Let me ask you, with regard specifically to your 3604 claim, how has the city made unavailable? Isn't that your allegation? It has- yes, it is our allegation, and it has made housing unavailable by the way that it targets minority neighborhoods for demolition. So these houses that are being destroyed through demolition makes houses- makes housing unavailable or otherwise unavailable. Are those houses owned by people in the neighborhood? Are they owned by absentee landowners of record that can be identified? Both, Your Honor. So some of them are owned by absentee landlord homeowners that can be identified, and some are owned by- all that we know is by people that are on the Dallas Central Appraisal District as title owners. So what efforts have been made to contact those people, either by the city or by the Homeowners Association, to contact those people and compel them to clean up their property or to speak for the city. But as far as TSRA members are concerned, they have reached out to owners of properties. But once the city applies for demolition, the time gap becomes very narrow. At least three months that the TSRA member has to contact an owner and try to negotiate a title transfer. So once that in the sheet that that process is in place, the time is very short before the Landmark Commission must set some of these demolition applications. Mr. Jasso, let me explore the difference between Subsection H and Subsection I because I was struck by the city's statement that Subsection I was promulgated after two years of public discussion, including with historical landmark groups and with representatives of I think minority communities, which makes it seem like an unlikely candidate for violation of equal protection or fair housing. And the way I read that, are you contending that Subsection I itself was promulgated in order to injure your neighborhood? Your Honor, we are alleging, well, first off, in the record, no member from a minority historic district ever went in front of these meetings to support their approval of this new Subsection I. We are saying that this Subsection I was promulgated with the effect of making housing unavailable. But you're not, but that's not as an equal protection matter with racial intent. Yeah. Where do you allege that? We allege that in our second claim and in our third claim. I know, well, let me, going to your gray brief, Claim 3 includes the use of 405I as part of the violation of the 14th Amendment. It doesn't say it was, this is what, you know, your complaint is many pages long and I'm trying to discover exactly what you're defending or attacking. Certainly the application of I is what you're, okay. So as to that, I don't understand what's so unfair about this. A 3,000 square foot house is not a small house, right? And to the extent that 3,000 square foot houses appear on Swiss Avenue, with which I'm familiar, those are not small houses, you know? So facially neutral. And not only that, after the order of the blight order is given, the thing has to go to the Landmark Commission or some other, and while it may defer, it's not, you have not for demolition since 2010 has been approved by that commission, have you? What we allege, your honor, is that every, the way the city targets minority neighborhoods, so since they have enforcement power, they must bring the municipal court action as a prerequisite to subsection I. I understand that, but they have to do that for H as well. They do not. It's only an owner that can apply under that subsection. So the city has no enforcement power under subsection H. Whether there's a municipal court order in place is irrelevant to the analysis under subsection H. I asked you a question, which is, have you alleged that every application for demolition that has come before that commission under subsection I has been granted? No, we have not alleged that, your honor. Okay. And the second thing is that while the number of approved applications in this decade appears to be at a, I forget, four per year, the number of actual demolitions is less than two per year. Is that not correct? That is not correct, your honor. That supposedly appears from your own appendices. That is not correct, your honor. So under the previous, before subsection I was adopted, the demolition rate was about 2.4 demolitions per year. And after the subsection I was adopted, it jumped to almost four demolitions. Now, those are the approvals. Those are not the demolitions. That is correct, your honor. Or some of the, there have been some approvals where there have been no demolitions. There has been a few because the landmark commission, be it protest by the association members, denies them. But the city goes to the city planning commission to seek reversal because of the mandatory nature of the ordinance language that says you must approve once the city obtains a municipal court order. Well, I'll go with that a little further with the other council. And then the final thing I'd say is, explain to me what is the goal of your equal protection claim? Our goal of our equal protection claim is to provide the district and the neighborhood with the same resources that are provided to majority white historic districts. So municipal services, the lack of streets and 10th street, the lighting, et cetera, is far inferior. So we're only asking that we put in the same level as other white historic districts. And what's your best case to support that proposition? That would be neighborhood action coalition versus city of Canton under the sixth circuit, your honor. And I see my time is up. I would like to reserve the rest. Let me ask you one other thing. I mean, the lighting and services of the city is not affected by the amendment, is it? No, but under our equal protection claim, your honor, we use subsection I as part of the evidence along with other factors under the Arlington Heights analysis. So municipal services are inferior. We also allege that the tax subsidy is also causing intentional discrimination because of the way. But as I understand your suit, you're challenging the amendment and the detriment that the neighborhood has suffered as a result of the amendment. We allege various claims, your honor, and one of them is pursuant to subsection I, which was the amendment in 2010. But we also allege other historic preservation issues that are done unequally by the city. Thank you. Okay, we'll move to Mr. Palmer. Good morning, and may it please the court. My name is Nicholas Palmer and I represent the Appalee, the city of Dallas, Texas. In this case, appellant 10th Street Residential Association, who I will refer to as TSRA, attempts to challenge section 51A-4.501 subsection I of the Dallas City Code, alleging violations of the Fair Housing Act, specifically 42 U.S.C. section 3604A and the Equal Protection Clause of the U.S. Constitution. This court should affirm the district court's judgment because as the district court held, TSRA cannot demonstrate any of the three essential requirements for Article III standing to prosecute this suit. This morning, I intend to first discuss why TSRA cannot demonstrate an actual or imminent injury in fact under either an organizational or an associational theory of standing. And then I hope to conclude with a brief discussion on TSRA's inability to demonstrate traceability or redressability. Before I get into those main points, however, I do want to make a record clarification in response to some of your questions. Paragraph 71 of TSRA's amended complaint reflects that although the city has obtained 32 certificates of appropriateness for demolition from the Landmark Commission since 2010, only 17 of those homes have actually been demolished. And that is because even after the the the last result, if we can still reach some other result, if somebody can acquire the property and rehabilitate the property within the six months that that certificate of appropriateness is valid, the city will still work with those individuals. An example of this can actually be seen in the at Record of Appeal 1042 through 45. Those are excerpts from a hearing before the city's Landmark Commission where one of the TSRA's members had attempted to purchase a home that was subject to be demolished, was unable to do so because of issues with contacting the absentee owner, and the city actually committed to the Landmark Commission that even though it was asking for a certificate of appealability, it would not, excuse me, certificate of appropriateness for demolition. The city went on the record and said, we will not demolish this home for four months. We will not begin the demolition process for four months to give this TSRA member additional time to try to locate the absentee owner and acquire the property. Turning first to TSRA's inability to establish injury in fact, I'd like to first address why TSRA cannot demonstrate organizational standing. And all of TSRA's allegations boil down to essentially two theories of injury under an organizational theory. One, that they suffer a loss or injury because of the human resources that they have dedicated to opposing demolitions before the city's Landmark Commission. And second, the loss of prospective members who are unable to buy demolished homes in the 10th Street residential district. First, as this court held in the NAACP versus City of Kyle, in order for an organization's expenditure of resources to constitute Article III injury in fact, the plaintiff must demonstrate that the organization diverted significant resources and that diversion significantly and perceptively impaired the organization's ability to engage in its day-to-day normal activities. And this makes sense because if the organization, the expenditure of resources was an expenditure, financial or time, human resources would otherwise have been made, then there is no injury to the organization because they're engaging in their day-to-day activities. The only resources that TSRA has identified in their amended complaint are the attendance of its president, its secretary and other identified members at the Landmark Commission hearings. I think what is particularly, what is notably absent from TSRA's amended complaint as well as their original complaint, they had two bites at the apple to allege this, was TSRA does not allege that its members would not appear before the Landmark Commission during subsection H proceedings. So if... Mr. Palmer. Yes, sir. Tell me what the city's rational reason was for distinguishing between houses under 3,000 square feet and over 3,000. Your honor, I don't believe that the rationale is reflected anywhere specifically in the record other than that through the legislation process. It was originally recommended that subsection I apply universally to all structures within historic districts in the city of Dallas. After committee hearings before the zoning board as well as the city plan commission, different advocacy groups, including the amici in this case, urged and those bodies adopted their recommendation that it should apply only to structures of smaller than 3,000. But I do not believe the city has to have a rational basis at this juncture in the case because TSRA does not have standing to challenge the city's ordinance. So you can't tell me a rational reason why the distinction was made. Well, I think a rational reason would just be because of the parties and the different interests that are at play in these larger structures. It certainly makes sense for business structures, commercial structures to have a different standard because businesses might be more interested in acquiring properties, rehabilitating them. Maybe they can work them out for their commercial reasons. And with respect to the distinction in square footage, there is only one district, according to the record, that has a majority of homes over 3,000 square feet. I believe that that was the Swiss Avenue Historic District that Judge Jones spoke of previously. Although other districts have residences that are over 3,000 square feet in size, all other districts have a majority of homes that are lower than 3,000 square feet. The amendment only applies to historical districts? That's correct, Your Honor. This is specific to historical districts. How many other historical districts have houses under 3,000 square feet? All of them. All of them have houses under 3,000 square feet. Only one has a majority of homes that are over 3,000 square feet. Every other district has homes that are a majority of homes that are under 3,000 square feet. And for my information, how many historical districts are we talking about in Dallas? My best recollection, Your Honor, I'd have to confirm in the record, it's in the complaint, I believe we're 13. Oh, really? Yes, Your Honor. Counsel, what's your best case? Your authority that decreased property values would not be an injury, in fact, for purposes of the 1982 and 1983 claims? It's not the city's contention that a decreased property value is not an injury. In fact, I believe this court actually held last year that government action that results in decreased property value is an actionable injury, in fact. What the city's argument is that on this record, according to TSRA's own evidence offered in support of their response to the city's motion to dismiss, specifically at pages 1288 to 295 of the record, homes in the 10th Street residential historic district increased in property value in 2019. And that's from TSRA's own evidence that contradicts their allegations that the homes have decreased in similar houses? Your Honor, unfortunately, that's not in the record. Again, this wasn't the city's evidence. This was TSRA's evidence in response to the city's motion to dismiss. They included appraisals from 10th Street homes that showed that they had significantly increased in value in 2019. And also, I'd like to, I know your question, Judge Inglehart, was specific with respect to equal protection claims. But I would like to point out that under 42 U.S.C. 3604A, the Fair Housing Act claims that they have brought, that this court held in Cox v. City of Dallas that, quote, the plain language of section 3604A does not apply to current homeowners whose complaint is that the value or habitability of their houses has decreased because such a complaint is not about, quote, availability, end quote. And that's what 3604A protects against. It protects against discrimination or making homes unavailable on the basis of a protected category. All of TSRA's members are current homeowners in TSRA or current residents in the 10th Street Residential Historic District. They have not. So it would be the owners of the demolished homes that would be able to bring the claim or not? It would be, it wouldn't even be the owners of the demolished homes because they are, they have already availed themselves. They had the property that was available to them. Somebody who could perhaps bring a claim was somebody who was trying to purchase a home in the 10th Street Residential Historic District and was thwarted by doing so because that home was demolished. But that has not happened to any TSRA members because they already own or reside in properties within the 10th Street Historic District. Are there any applications for demolition pending now, either in court or before the commission? No, your honor. And I think that goes to the city's resolution that was attached to its appendix. That resolution essentially moots TSRA's request for injunctive relief because as of August 2019, in part from lobbying efforts by TSRA to the city council, the city council passed a resolution that said the city will not spend any resources on demolitions in the 10th Street Historic District. So it doesn't change the ordinance, rather it's a resolution. Is that correct? That's correct. I take it there's a difference in terms of an operative governing authority between an ordinance and a resolution. That's correct. The resolution does not change the ordinance. It instructs the city manager how to use his powers and not to use any of his spending to affect these demolitions. So the 2019 resolution moots out all of the claims in this case? No, your honor. I think there's still a controversy over the ordinance itself, but to the extent that TSRA's request for equitable relief, their injunction, they have asked specifically that the city be enjoined to use only the subsection H procedures to demolish homes in the 10th Street Historic District. Under the city's resolution, we cannot even demolish homes under subsection H. No demolitions are occurring at all in 10th Street as of this moment, until further action of the city council. The city council at the next meeting could rescind that resolution, right? At a future meeting, yes, your honor, that could happen. Have the steps been taken to amend the statute or the ordinance? I know the ordinance is under review. There is nothing firm in terms of drafts of what might happen has been released yet. Well, if this all goes on long enough, all those structures will be eligible for demolition under section J as an imminent public danger, but that's just a rhetorical comment. Mr. Palmer, didn't the city move for the failure to state a claim under 12b-6? Yes, your honor, the city did move as well for failure to state a claim under 12b-6. You don't appear to be arguing that in your brief. Is that also correct? That's correct, your honor. The district court made its ruling solely on the city's standing arguments. The district court has yet to reach a decision on the 12b-6. What's the city's position on the equal protection claim, just solely on equal protection, which requires intentional discrimination? Yes, your honor, the city's contention under the equal protection claim, is it defendant or the plaintiff's lack standing here because, in part, what I said about the Cox v. City of Dallas case previously, all of TSRA's members are current homeowners or residents in TSRA, and there's nothing on the face of the ordinance that says it is, or let me restate that. Facially, the ordinance is neutral. It applies to all historic districts, and it even applies to the historic district that has a majority of homes over 3,000 square feet to the smaller homes in that residential district. I think the amended complaint is best read as an as-applied challenge to the city's enforcement of the subsection I procedures. That being said, I don't think there are sufficient factual allegations in the amended complaint to bring that as-applied challenge, and that is because there are no allegations that the city has used any other mechanism before the landmark commission to earn or to obtain a certificate of appropriateness for demolition to any home in another historic district that would be subject to the subsection I procedures. There's no allegation and no evidence of disparate treatment to homes that would fall within subsection I. Well, there's an allegation that the commission is obliged to rubber stamp the order, the court order, and they don't, as a matter of course, schedule a hearing. That is correct, your honor, but there is no allegation that the city has, as my colleague on the other side mentioned a moment ago, the subsection H does not require a municipal court to declare the property a public nuisance. You go directly to the landmark commission to obtain a demolition under subsection H, but there's been no allegation that the city has used different procedures for any property in any of the historic districts that would qualify for subsection I, for demolition under subsection I. Those procedures, the subsection I procedures, have always been used. I do want to- But, I mean, I think their argument is that, sure, they can go to the commission, but that's meaningless procedure afforded to them. I understand that's your argument, or that's their argument. I think that there are, it's a higher standard of review for them to overcome under subsection I, but they do have the time gaps that are permitted for an interested person to come in and try to purchase the property. Unfortunately, because a lot of these properties have absentee homeowners and their title issues, it's difficult for anyone to acquire the property, which is why the city has to take action against the property in REM to demolish the homes and abate the nuisance. I do want to spend one moment on traceability just to make the observation that to the extent that TSRA is complaining about property values, that TSRA is complaining about the ambiance and nature of living in a historic district and the threat that demolitions pose to that, their grievance isn't one with the city. Their grievance is one with the absentee property owners or the current property owners and residents who fail to maintain their property in a manner that means it's not a public nuisance. The city is only demolishing homes which a court has found constitute a public nuisance, and that is a home that is, quote, dilapidated, substandard, or unfit for human habitation, and a hazard to the public health, safety, and welfare, end quote. That ordinance is found on page 544 of the record. A court has found that these properties are in the, with respect to the 10th Street's inclusion on the Register of National Historic Locations, the 36 CFR section 60.15 says that they will be subject to being removed from the National Register, not just because of the destruction of the properties, but because the qualities which caused it to be originally listed have been lost, and they are certainly lost by the owner's failure to maintain their property in a non-nuisance state. I see I'm out of time. May I briefly conclude in one sentence? Yes. For all of these reasons, your honors, as well as those stated in the city's brief, I respectfully request the court affirm the judgment of the May I please the court? Go back to 5. There you go. May I please the court? Just a few points on rebuttal, what my colleagues said on the other side regarding some of their arguments. So as far as the organizational injury, significant resources that City of Kyle quoted, that they were quoting the pleadings in another case. As OCA found, the standard is the same as per person under injury or Lujan standards anyways. As far as long as there's an identical trifle, injury is found. Regarding the 3,000 square foot rule and Judge Jones, there's 10 historic districts in Dallas, and only two don't have any structures greater than 3,000 square feet, and those are minority historic districts, and one of them being 10th Street. And, you know, regarding my colleagues, you know, his point about property values in 10th Street, we allege that they are lower or increased at a lower rate. You know, in the record, we provided property values from 2014 and 2018, and they decreased every value every year. Only in 2019, after we filed the complaint, after we filed the amended complaint, did property values increase, and that was the same all across the city, but they increased at a lower rate than a white historic. Let me ask you about your equal protection claim, because it strikes me that what you're really trying to achieve here is protection of the minority community through your equal protection claim. Municipal services and other city actions to be put on the same level. Well, your allegations about municipal services were very vague or very, you know, incomplete, I thought, but leaving that aside, I mean, what you're really trying to do, aren't you, is to keep the 10th Street area segregated. That is not true, Your Honor. What we're trying to do is redress some of the injuries that the city has applied to the neighborhood, trying to- I'm providing, I mean, if it were a free market, anybody under the Fair Housing Act, anybody could move in and rehabilitate those houses, but what you want, your organization, and I'm just posing this because it occurred to me, and maybe I'm wrong, but your organization wants resources so that you can all stay the way you are, which is to say segregated. They want to be treated equally, just like other historic districts in the city. I want to focus a little bit on traceability. So in OCA Greater Houston, that court held, this circuit held that the traceability prong is met if the government entity has any enforcement connection with the challenged statute or ordinance. Here, subsection I is a city ordinance and is enforced by the city attorney. They're the only ones that can bring the municipal court action as a prerequisite to subsection I. If there's no municipal court order, there is no subsection I demolition. That application must go through subsection H, and only the owner there has any power to do anything. The city is powerless under subsection H. We provided in our written complaint that the city has issued 49 certificates of demolition pursuant to subsection I, and 48 of those have been in minority historic districts. That means 97 percent of the subsection I demolitions have been in minority historic districts. We also show that the city is 24 times more likely to issue a subsection I certificate of demolition for a substandard structure in a minority occupied landmark district. This shows that the city's use of subsection I, and not the owner's, is the cause of the demolition. Under OCA Greater Houston, the city's enforcement power shows traceability. Briefly, touching upon movements, your honors, the city, subsection I is still in effect. It's in the books. It does nothing to move the other claims. Under precedent from this court, in Cooper v. McBeef, which Judge Jones authored, and City of Mesquite under the Supreme Court, in those cases, mootness was a closer issue that the ordinance in those cases had been at least amended. We don't have that here. Whether moot or not, what is it, what relief are you seeking over and above what the resolution accomplishes? That the city no longer, as far as the subsection I demolitions, that the city no longer target the neighborhood for demolition as it's doing aggressively. And under our tax ordinance claim, that it provide resources and funds in an equitable manner, not according to property values. That would be fair to the association members. Tell me what significant difference there is in the standard for demolishing a house for under 3,000 square feet and over 3,000 square feet. My time is almost up. Can I proceed to answering the question? Certainly. Yeah, what is the significant difference in the standard under the amendment for demolishing a house under 3,000 square feet and over 3,000 square feet? So if the house is under 3,000 square feet and the city obtains a municipal court order under subsection I, the landmark commission must approve the demolition. Under subsection H, the protections are far greater. The owner, the applicant must show records and studies by architect and engineer regarding the feasibility and cost of restoration. And even then, the ordinance is written in such a way that the landmark commission must deny unless there's no other reasonable way of securing the premises. Let me ask you one final question, Mr. Jasso. He does focus on the fact that you have to have a court order that this is a nuisance. You're not, you can't allege that the courts are acting in a racially discriminatory manner by declaring these places nuisances, can you? We are not, but we're alleging that the city is nuisance, could he not? I believe that is correct. That's not on the record, but I believe that is correct. So you're really asking us to say that a nuisance is not good enough, you know, though approved by the court. I'm a little uncomfortable about that idea. No, because under subsection H, even if there is a municipal court order, the landmark commission is not, it's irrelevant to that analysis. There could be a municipal court order for years, multiple municipal court orders on the same property. It's the city's being the plaintiff in those courts, in those municipal court actions that provides the enforcement power and connection that holds the traceability prompt. And what's your response to the argument that Cox v. City of Dallas says that the landowner members of the association do not have standing to sue? Cox did not, yeah, your honor, Cox did not say that. It was a 12 v. 6. It was dismissed on a failure to state a claim. The injuries were there, there was just no housing made unavailable in that case, so there was no 36-04 claim. They had standing, the injuries were there, just they didn't state a claim, and that's how it was dismissed. Well, I mean, once a court has stated, said you don't have a claim, doesn't that mean that legally you're not injured? No, your honor. That's what I thought. No, the injuries were there, the diminution of property values, the court just held in Cox that since no houses were being made otherwise unavailable, there was no failure to state a claim. They may have Article III injuries, but it was not a cause of action under that statute. Okay, well, thank you very much, and with that, we will be dismissed.